UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CROSBY ESTATE AT RANCHO SANTA FE MASTER ASSOCIATION,<br><br>                              Plaintiff,<br><br>v.<br><br>IRONSHORE SPECIALTY INSURANCE COMPANY,<br><br>                              Defendant. | Case No.:  19-cv-2369-WQH-NLS<br><br>**ORDER** |

HAYES, Judge:

The matter before the Court is the Motion for Partial Summary Judgment filed by Plaintiff The Crosby Estate at Rancho Santa Fe Master Association. (ECF No. 15).

## I.    BACKGROUND

On December 10, 2019, Plaintiff The Crosby Estate at Rancho Santa Fe Master Association ("The Crosby") filed a Complaint against Defendant Ironshore Specialty Insurance Company ("Ironshore"). (ECF No. 1). In the Complaint, The Crosby alleges that it is insured under a policy issued by Ironshore. The Crosby alleges that it was sued in 2018 by a neighboring community homeowners' association and "tendered the defense of that lawsuit to Ironshore . . . ." (*Id.* ¶ 2). The Crosby alleges that Ironshore "dragged its feet," stated that Ironshore did not have a duty to defend "despite contrary language in the

applicable policy," and issued denials of coverage that it would later reverse. (*Id.*). The Crosby alleges that "Ironshore failed to pay a dime in defense costs until July 30, 2019, more than a year after The Crosby's tender." (*Id.*). The Crosby alleges that Ironshore agreed to reimburse The Crosby's defense costs at reduced rates, "not the actual amounts incurred by The Crosby when forced to retain defense counsel at its own expense." (*Id.*).

The Crosby brings claims against Ironshore for 1) breach of contract (duty to defend); 2) breach of contract (duty to indemnify); 3) breach of contract (unauthorized retention); 4) breach of the implied covenant of good faith and fair dealing; and 5) declaratory relief. The Crosby seeks damages, including punitive damages; a declaration that the insurance policy's "$50,000 retention does not apply where the Insured has tendered the defense of a claim and Ironshore has assumed the duty defend;" and attorneys' fees, costs, and prejudgment interest. (*Id.* ¶ 58).

On January 17, 2020, Ironshore filed an Answer to the Complaint. (ECF No. 7).

On March 30, 2020, The Crosby filed a Motion for Partial Summary Judgment on the first claim for breach of contract (duty to defend), the third claim for breach of contract (unauthorized retention), and the fifth claim for declaratory relief. (ECF No. 15). The Crosby contends that it tendered the defense of the 2018 lawsuit to Ironshore, triggering Ironshore's duty to defend. The Crosby contends that the 2018 lawsuit is potentially covered by the insurance policy, and the policy exclusions do not negate all possibility of coverage. The Crosby contends that Ironshore breached the terms of the insurance policy by failing to defend The Crosby and by requiring The Crosby to satisfy a retention as a condition of the duty to defend.

On April 20, 2020, Ironshore filed an Opposition to the Motion for Partial Summary Judgment. (ECF Nos. 16-21). Ironshore contends that has no duty to defend under the terms of the insurance policy. Ironshore contends that 2018 lawsuit is excluded from coverage. Ironshore contends that it did not breach the insurance contract because it agreed to advance

The Crosby's defense costs, and The Crosby was required to satisfy a retention. On April 27, 2020, The Crosby filed a Reply.[1] (ECF Nos. 27-30).

On August 27, 2020, the Court heard oral argument on the Motion for Partial Summary Judgment. (ECF No. 36).

## II.   FACTS

### a.  The Ironshore Insurance Policy

On June 30, 2017, Ironshore issued insurance policy number 0020840 to The Crosby ("Policy"). The Policy is an entity, directors', and officers' liability insurance policy "covering Policy Period July 2, 2017 [through] July 2, 2018 and providing a $1,000,000.00 limit of liability." (Pl.'s Statement of Facts, ECF No. 15-2 at 2 ¶ 1). The Policy provides coverage for "Claims:" "civil . . . proceeding[s]" alleging any "act, omission, error, . . . neglect or breach of duty" by The Crosby—the "Not-For-Profit-Entity" and an "Insured" under the Policy. (Policy, Ex. 1 to Salpietra Decl., ECF No. 15-4 at 12-13, 16 (emphasis omitted)). The Policy requires that the Insured give the "Insurer," Ironshore, notice of the Claim in writing. (*Id.* at 14 (emphasis omitted)).

The Policy provides:

> The Insured, and not the Insurer, have the duty to defend all Claims, provided that the Insured shall only retain counsel as is mutually agreed upon with the Insurer. The Not-For-Profit Entity may at its option tender to the Insurer the defense of a Claim. Such a tender of the defense of a Claim shall not be made more than 90 days following notice of the Claim pursuant to Section VII. Upon such a tender of the defense of a Claim, the Insurer shall assume the duty to defend.

(*Id.* at 20 (emphasis omitted)).

When a Claim is commenced against an Insured during the Policy Period, the Insurer is obligated to pay "Loss," including damages, judgments, settlements, interest, legal fees, costs, and expenses. (*Id.* at 14 (emphasis omitted)). The Insurer is not liable to pay Loss

---

[1] The parties submitted evidentiary objections (ECF Nos. 20, 30, 33), which have been reviewed by the Court.

for Claims that are excluded from coverage. The Policy excludes Claims based on contractual liability, Claims involving pollution, Claims for property damage, and Claims that are related to prior Claims against an Insured.

The Policy provides that the Insured is responsible for a $50,000 "Retention" that applies to "all covered Loss . . . ." (*Id.* at 19 (emphasis omitted)). The Policy provides that "[t]he Insurer shall be liable to pay Loss in excess of the applicable Retention amount . . . up to the Limit of Liability . . . ." (*Id.* (emphasis omitted)).

**b.  <u>The 2018 Avaron Lawsuit</u>**

On May 25, 2018, the Avaron Community Association ("Avaron"), filed a complaint against The Crosby and AMS Paving, Inc., in the Superior Court for the State of California, County of San Diego, assigned case number 37-2018-00026012-CU-BC-NC ("Avaron Lawsuit"). Avaron alleged that in 2007, Avaron and The Crosby entered into a "Shared Use Maintenance Agreement" giving The Crosby an easement for ingress and egress over Avaron's property. (Avaron Lawsuit Compl., Ex. 2 to Salpietra Decl., ECF No. 15-4 at 59). Avaron alleged that The Crosby 1) breached the Shared Use Maintenance Agreement by removing speedbumps on Avaron's property; 2) interfered with Avaron residents' quiet use and enjoyment by instigating "Operation Honk," a coordinated effort in which residents of The Crosby repeatedly honked their car horns when they passed over speedbumps on Avaron's property; and 3) intentionally destroyed and removed speedbumps on Avaron's property to allow residents of The Crosby to "drive as fast as they can through the easement without regard for the safety or well being of the residents and guests in Avaron." (*Id.* at 59-61). Avaron sought compensatory damages, punitive damages, termination of The Crosby's rights under the SUMA, and injunctive relief.

On June 4, 2018, The Crosby's counsel, Rick Salpietra, sent an email to Ironshore's third-party claim administrator that stated:

> The attached [Avaron Lawsuit] was filed against the Crosby[ ]on May 25, 2018, but has not yet been served . . . .

By operation of law, a responsive pleading should be filed no later than 30 days after service. Pursuant to the terms of its policy, The Crosby hereby tenders its defense to its insurance carriers, and request[s] that counsel be appointed within a reasonable time so that the proper responsive pleading may be filed within the time allowed by the Code of Civil Procedure. It is our understanding that a TRO in this matter is scheduled for Thursday, June 7-2018. The Board will have the firm of Procopio, Cory, Hargreaves & Savitch LLP represent it at the TRO hearing if a defense attorney is not appointed in time.

Inasmuch as the Complaint alleges covered claims, the Crosby is owed a defense to the allegations of the entire Complaint, as well as any indemnity that may be owed on a covered claim. Please confirm acceptance of this email in writing and advise us of the name of the appointed defense counsel as soon as possible. We are available to assist the retained counsel in this matter.

By copy of this email to Dana Diset and Leslie O'Connor, the Crosby requests all other Crosby insurers be put on notice of this claim.

(York Pro Email, Ex. 3 to Salpietra Decl., ECF No. 15-4 at 63-64). On June 5, 2018, Dana Diset from the "LaBarre/Oksnee Insurance Claims Department" responded, "Claims have been filed on the association's GL and D&O policies and an adjuster from each will be assigned shortly. The association should provide their own defense until the carriers have time to review and determine coverage/assign defense." (Diset Email, *id.* at 63).

On July 9, 2018, Ironshore's Vice President of Claims sent an email to The Crosby's counsel, Rick Salpietra, stating that a Senior Claims Specialist had been assigned to the Avaron Lawsuit and reserving Ironshore's rights under the Policy. Rick Salpietra sent an email to the Senior Claims Specialist that stated:

Crosby just received [the claims specialist assignment] letter, and we look forward to working with you on this matter. Since Avaron filed for a TRO last month, the Crosby retained its own counsel to defend the TRO while a coverage investigation was being conducted by the carrier. Crosby retained Rebecca Reed of Procopio firm [ ]. If possible, the Crosby would like to keep her as defense counsel if they are acceptable to Ironshore.

If not, please let me know [who] the appointed defense counsel is and we can provide relevant information to them.

(Salpietra Email, Ex. 5 to Salpietra Decl., ECF No. 15-4 at 70-71). The Senior Claims Specialist responded:

> Coverage is still being evaluated at this point as the Complaint contains claims for breach of contract and for destruction of property including loss of use which is excluded under the Policy.
>
> Once coverage is determined, we will address the Insured's inquiry regarding defense counsel.
>
> Ironshore expressly reserves all of its rights under the policy, in equity, and at law.

(Adjuster Email, *id.* at 70). Rick Salpietra replied, "The complaint was tendered over a month ago. Do you have an idea when coverage will be determined?" (Salpietra Email, *id.* at 69). The Senior Claims Specialist responded, "We hope to have coverage determined by the end of this week. Under the Policy, Ironshore does not have a duty to defend and the Insured has a retention. As such, the Insured can continue to use its counsel of choice pending review by Ironshore." (Adjuster Email, *id.*).

"On July 11, 2018, The Crosby executed a Notice and Acknowledgment of Receipt with respect to the Summons and Complaint for the Avaron Lawsuit."[2] (Pl.'s Statement of Facts, ECF No. 15-2 at 9 ¶ 21).

"On July 13, 2018, Ironshore denied coverage of the Avaron Lawsuit, citing the Policy's exclusions for breach of contract . . . and damage to or destruction of property . . . ." (*Id.* at 9 ¶ 23).

---

[2] Ironshore requests that the Court take judicial notice of The Crosby's Notice and Acknowledgement of Receipt. (ECF No. 17 at 2). Ironshore's request for judicial notice is granted. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (explaining that it is appropriate to take judicial notice of court filings and other matters of public record, such as pleadings in related litigation).

The Crosby requested reconsideration. On July 24, 2018, Ironshore denied coverage of the Avaron Lawsuit again, citing the Policy's exclusions for breach of contract, destruction of property, and pollution. The Crosby again requested reconsideration.

On August 20, 2018, Ironshore's coverage counsel sent a letter to Rick Salpietra that stated, in relevant part:

> As you know, Crosby initially provided the [Avaron] Lawsuit to [Ironshore][3] seeking defense and indemnity with respect to this matter. That request was previously denied . . . .
>
> **Please be advised that as a courtesy to Crosby, [Ironshore] hereby agrees to provide a defense to the Lawsuit without prejudice to [Ironshore]'s rights under the Policy.**

(Lewis Letter, Ex. 9 to Salpietra Decl., ECF No. 15-4 at 86-87).

On September 11, 2018, the Senior Claims Specialist sent an email to Rebecca Reed of Procopio, stating that Ironshore understood that Reed was "retained to defend the Insured in this matter" and requesting Reed's billing rates. (Adjuster Email, Ex. L. to Def.'s App'x, ECF No. 21 at 130). After Ironshore received Reed's rates, on September 14, 2018, the Senior Claims Specialist sent an email to Rick Salpietra stating that Ironshore "will not pay [the] hourly rate of $450.00" for Reed, "nor will that amount be applied to the retention." (*Id.* at 129). The Senior Claims Specialist stated, "In San Diego a reasonable hourly rate for this type of case would be $250 for partners, $200 for associates and $100 for paralegals. The Insured can choose to pay Ms. Reed's hourly rate above the Ironshore rate and outside their retention." (*Id.*). On September 18, 2018, Rick Salpietra responded, "The Crosby board has agreed to pay Ms. Reed's hourly rate above the Ironshore rate and outside their retention." (Salpietra Email, *id.* at 128). "Ironshore never offered to assign

---

[3] Ironshore was acquired by Liberty Mutual in May 2017. Communications from Ironshore refer to the Insurer as "Ironshore," "Liberty," or "Ironshore acting on behalf of Liberty Insurance Underwriters Inc." (*See, e.g.*, Denial Letter, ECF No. 15-4 at 75). The Court refers to the Insurer as "Ironshore" for clarity and consistency.

counsel to defend the Avaron Lawsuit." (Pl.'s Statement of Facts, ECF No. 15-2 at 10 ¶ 27).

On September 18, 2018, Avaron filed a first amended complaint in the Avaron Lawsuit. Avaron added allegations that The Crosby failed to enforce speed limits on the easement road, Bing Crosby Boulevard, and that The Crosby organized its residents "throwing food and trash from their cars." (Avaron Lawsuit First Am. Compl., Ex. 10 to Salpietra Decl., ECF No. 15-4 at 101).

"Ironshore commenced advancing defense amounts in July 2019." (Def.'s Statement of Facts, ECF No. 19 at 38 ¶ 39). "In August 2019, The Crosby entered into an agreement to settle the Avaron Lawsuit and Ironshore declined The Crosby's request to contribute toward the settlement." (Pl.'s Statement of Facts, ECF No. 15-2 at 11 ¶ 30).

## III.   LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). Where the party moving for summary judgment bears the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (citation omitted). If the moving party meets the initial burden, the burden shifts to the opposing party to show that summary judgment is not appropriate. *Anderson*, 477 U.S. at 256;

*Celotex*, 477 U.S. at 322, 324. The nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient."). The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (citations omitted). The nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 256.

## IV.   DUTY TO DEFEND

The Crosby asserts that it is entitled to summary judgment on the first claim against Ironshore for breach of the duty to defend.

### a.   <u>Option to Tender</u>

The Crosby contends that the Policy imposes a duty to defend on Ironshore when the Not-For-Profit Entity tenders the defense of a Claim. The Crosby contends that it tendered the defense of the Avaron Lawsuit to Ironshore pursuant to the terms of the Policy on June 4, 2018, triggering Ironshore's duty to defend.

Ironshore asserts that it has no duty to defend under the terms of the Policy. Ironshore contends that the Policy is a "Directors & Officers' policy that places a retention and defense obligation on the insured." (ECF No. 16 at 8). Ironshore contends that at the time of The Crosby's alleged tender on June 4, 2018, the Avaron Lawsuit had not been served and was not a Claim under the Policy. Ironshore contends that The Crosby's June 4 email was "not even directed to the Ironshore policy specifically." (*Id.* at 22). Ironshore contends that "although a 'duty to defend' is set forth as a potential secondary and alternative duty under . . . the Ironshore Policy," The Crosby's decision to retain its own counsel precludes Ironshore from having any duty to defend. (*Id.* at 21).

Under California law, the elements of a cause of action for breach of contract are: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's

breach, and (4) damage to plaintiff therefrom." *Wall St. Network, Ltd. v. N.Y. Times Co.*, 164 Cal. App. 4th 1171, 1178 (2008) (citation omitted). Federal courts apply state law to interpret an insurance policy. *Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co.*, 546 F.3d 1142, 1145 (9th Cir. 2008) (citing *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)). Under California law, "interpretation of an insurance policy is a question of law." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (citing *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 818 (1990)), *as modified on denial of reh'g* (Oct. 26, 1995).

"The ordinary rules of contract interpretation apply equally to contracts of insurance." *Am. Alternative Ins. Corp. v. Superior Court*, 135 Cal. App. 4th 1239, 1245 (2006) (citing *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999)). "The mutual intention of the contracting parties at the time the contract was formed governs." *Id.* (citing Cal. Civ. Code § 1636; *Palmer*, 21 Cal. 4th at 1115). "In construing the language of an insurance policy, a court should give the words used their plain and ordinary meaning, unless the policy clearly indicates to the contrary." *Giddings v. Indus. Indem. Co.*, 112 Cal. App. 3d 213, 218 (1980) (citations omitted). Courts "read a contract as a whole in order to 'give effect to every part, if reasonably practicable, each clause helping to interpret the other.'" *Van Ness v. Blue Cross of Cal.*, 87 Cal. App. 4th 364, 372 (quoting Cal. Civ. Code § 1641). "Where contract language is clear and explicit and does not lead to an absurd result, [the court] ascertain[s] [the parties'] intent from the written provisions and go[es] no further." *Id.* (citing Cal. Civ. Code §§ 1638, 1639; *AIU Ins. Co.*, 51 Cal. 3d at 822); *see Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992) (if a policy's language is "clear and explicit, it governs"). "[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured . . . ." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003) (citation omitted), *as modified on denial of reh'g* (Sept. 17, 2003).

In this case, the Policy provides:

The Insured, and not the Insurer, have the duty to defend all Claims, provided that the Insured shall only retain counsel as is mutually agreed upon with the

Insurer. **The Not-For-Profit Entity may at its option tender to the Insurer the defense of a Claim.** Such a tender of the defense of a Claim shall not be made more than 90 days following notice of the Claim pursuant to Section VII. **Upon such a tender of the defense of a Claim, the Insurer shall assume the duty to defend.**

(Policy, Ex. 1 to Salpietra Decl., ECF No. 15-4 at 20 (emphasis added)). Pursuant to the Policy's plain language, the duty to defend belongs to The Crosby unless The Crosby, "at its option," tenders the defense to Ironshore. (*Id.*). Although directors' and officers' policies "generally do not obligate the carrier to provide the insured with a defense," *Hefland v. Nat'l Union Fire Ins. Co.*, 10 Cal. App. 4th 869, 879 (1992), the Policy in this case explicitly provides an option to tender to the Insurer "the defense of a Claim." (Policy, Ex. 1 to Salpietra Decl., ECF No. 15-4 at 20 (emphasis omitted); *see Gon v. First State Ins. Co.*, 871 F.2d 863, 867 (9th Cir. 1989) (finding no duty to defend in a directors' and officers' policy where "[t]here is no language in the policy stating that [the insurer] will defend any claims")). Under the terms of the Policy, Ironshore assumes the duty to defend upon "tender of the defense of a Claim." (Policy, Ex. 1 to Salpietra Decl., ECF No. 15-4 at 20 (emphasis omitted)).

The Policy defines "Claim" as

a civil, criminal, governmental, regulatory, administrative, or arbitration proceeding made against any Insured seeking monetary or non-monetary relief and commenced by the service of a complaint or similar pleading, the return of an indictment, or the receipt or filing of notice of charges or similar document, or other written demand for monetary or non-monetary relief made against any Insured.

(*Id.* at 33 (emphasis omitted)). The Policy requires that the Insured give notice of any Claim in writing to Ironshore at "28 Liberty Street, 5th Floor New York, NY 10005." (*Id.* at 27).

On June 4, 2018, The Crosby's counsel, Rick Salpietra, sent an email to Ironshore's third-party claim administrator that stated, in relevant part:

The attached [2018 Avaron Lawsuit] was filed against the Crosby[ ]on May 25, 2018, but has not yet been served . . . .

By operation of law, a responsive pleading should be filed no later than 30 days after service. Pursuant to the terms of its policy, **The Crosby hereby tenders its defense to its insurance carriers, and request[s] that counsel be appointed within a reasonable time** so that the proper responsive pleading may be filed within the time allowed by the Code of Civil Procedure. It is our understanding that a TRO in this matter is scheduled for Thursday, June 7-2018. The Board will have the firm of Procopio, Cory, Hargreaves & Savitch LLP represent it at the TRO hearing if a defense attorney is not appointed in time.

Inasmuch as the Complaint alleges covered claims, the Crosby is owed a defense to the allegations of the entire Complaint, as well as any indemnity that may be owed on a covered claim. Please confirm acceptance of this email in writing and advise us of the name of the appointed defense counsel as soon as possible. We are available to assist the retained counsel in this matter.

By copy of this email to Dana Diset and Leslie O'Connor, the Crosby requests all other Crosby insurers be put on notice of this claim.

(York Pro Email, Ex. 3 to Salpietra Decl., ECF No. 15-4 at 63-64 (emphasis added)). Dana Diset from the "LaBarre/Oksnee Insurance Claims Department" responded, "Claims have been filed on the association's GL and D&O policies . . . ." (Diset Email, Ex. 3 to Salpietra Decl., ECF No. 15-4 at 63). Ironshore assigned a Senior Claims Specialist, and on July 9, 2018, Rick Salpietra reminded the Senior Claims Specialist that The Crosby tendered the defense of the Avaron Lawsuit. (*See* Salpietra Email, Ex. 5 to Salpietra Decl., ECF No. 15-4 at 69 ("The complaint was tendered over a month ago.")).

The Crosby repeatedly requested that Ironshore appoint defense counsel and notified Ironshore that The Crosby retained its own counsel while the coverage determination was pending. (*See* York Pro Email, Ex. 3 to Salpietra Decl., ECF No. 15-4 at 63-64 (requesting "that counsel be appointed within a reasonable time so that the proper responsive pleading may be filed" and stating, "The Board will have the firm of Procopio, Cory, Hargreaves & Savitch LLP represent it at the TRO hearing if a defense attorney is not appointed in time"); Salpietra Email, Ex. 5 to Salpietra Decl., ECF No. 15-4 at 70-71 ("Since Avaron filed for a TRO last month, the Crosby retained its own counsel to defend the TRO while a coverage

investigation was being conducted by the carrier . . . . If possible, the Crosby would like to keep her as defense counsel if they are acceptable to Ironshore. If not, please let me know [who] the appointed defense counsel is and we can provide relevant information to them."); Adjuster Email, Ex. 5 to Salpietra Decl., ECF No. 15-4 at 69 (response from the Senior Claims Specialist stating that The Crosby "can continue to use its counsel of choice pending review by Ironshore")). On August 20, 2018, Ironshore's coverage counsel acknowledged that The Crosby had "provided the [Avaron] Lawsuit to [Ironshore] seeking defense . . . with respect to this matter." (Lewis Letter, Ex. 9 to Salpietra Decl., ECF No. 15-4 at 86).

The Crosby has come forward with evidence that the Avaron Lawsuit is a Claim under the Policy—a civil proceeding against an Insured "seeking monetary or non-monetary relief" that is "commenced by the service of a complaint or similar pleading." (Policy, Ex. 1 to Salpietra Decl., ECF No. 15-4 at 33). The Crosby has come forward with evidence that on June 4, 2018, it gave notice of the Claim in writing to Ironshore's third-party claim administrator within the Policy Period of July 2, 2017, through July 2, 2018.[4] *See* Cal. Civ. Code § 2332 (notice to agent is equivalent to notice to the principal). In the June 4 letter, The Crosby explicitly "tender[ed] its defense to its insurance carriers," which included Ironshore. (York Pro Email, Ex. 3 to Salpietra Decl., ECF No. 15-4 at 63). The Crosby has come forward with evidence that it tendered the defense of the Avaron Lawsuit to Ironshore, triggering Ironshore's duty to defend under the Policy. Ironshore has failed to demonstrate that a material issue of fact exists as to whether the Policy places a duty to defend on Ironshore or whether The Crosby tendered the defense of the Avaron Lawsuit to Ironshore. The Court concludes that the plain language of the Policy and The Crosby's June 4, 2018, tender imposed on Ironshore a contractual duty to defend all claims asserted

---

[4] Although The Crosby had not been served with the Avaron Lawsuit on June 4, 2018, on that date the Avaron Lawsuit was a civil proceeding "commenced by the service of a complaint or similar pleading" and was a Claim under the Policy. (Policy, Ex. 1 to Salpietra Decl., ECF No. 15-4 at 33).

in the Avaron Lawsuit if any claim was potentially covered by the Policy at the time of tender. *See Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 295 (1993) (en banc).

### b. <u>Potential for Coverage</u>

The duty to defend in an insurance contract is distinct from the duty to indemnify or advance defense costs. *See Hefland*, 10 Cal. App. 4th at 879; *Gon*, 871 F.2d at 867-68. In contrast to a duty to indemnify or advance defense costs, a duty to defend means a duty to "mount and fund a defense" and to "defend entirely." *Buss. v. Superior Court*, 16 Cal. 4th 35, 59 & n.23. Where an insurance contract imposes a duty to defend on an insurer, the insurer "owes a broad duty to defend its insured against claims that create a potential for indemnity." *Montrose*, 6 Cal. 4th at 295 (citations omitted). "[T]he duty to defend is so broad that it only requires 'a bare potential or possibility of coverage as the trigger of a defense duty.'" *Nat'l Union Fire Ins. Co. v. Seagate Techs., Inc.*, 466 F. App'x 653, 655 (9th Cir. 2012) (quoting *Montrose*, 6 Cal. 4th at 300).

However, the duty to defend does not arise "if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage." *La Jolla Beach & Tennis Club, Inc. v. Indus. Indem. Co.*, 9 Cal. 4th 27, 39 (1994) (citations omitted).

> [I]n an action wherein none of the claims is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer does not have a duty to defend. This freedom is implied in the policy's language. It rests on the fact that the insurer has not been paid premiums by the insured for [such] a defense . . . .

*Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 655 (2005) (second and third alterations in original) (citations omitted).

"[T]he existence of a duty to defend turns . . . upon those facts known by the insurer at the inception of a third party lawsuit." *Montrose*, 6 Cal. 4th at 295 (citation omitted). The court "compar[es] the allegations of the third party complaint with the terms of the policy." *El-Com Hardware, Inc. v. Fireman's Fund Ins. Co*., 92 Cal. App. 4th 205, 212

14

(2001). The proper focus is on the facts alleged, rather than the theories for recovery. *See Gray v. Zurich Ins. Co*., 65 Cal. 2d 263, 276 (1966) (en banc). "[T]he duty to defend arises when the facts alleged in the underlying complaint give rise to a potentially covered claim regardless of the technical legal cause of action pleaded by the third party." *Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500, 510 (2001) (citation omitted).

To prevail on a motion for summary judgment regarding the duty to defend, "the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*." *Montrose*, 6 Cal. 4th at 300. "Where there is doubt as to whether the duty to defend exists, the doubt should be resolved in favor of the insured and against the insurer." *Hudson Ins. Co. v. Colony Ins. Co.*, 624 F.3d 1264, 1267 (9th Cir. 2010) (citation omitted). "[A]mbiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations." *E.M.M.I. Inc. v. Zurich Am. Ins.*, 32 Cal. 4th 465, 470 (2004) (citation omitted). Courts determine "the meaning a layperson would ordinarily attach" to policy language. *Waller*, 11 Cal. 4th at 18. "[E]xclusionary clauses are interpreted against the insurer." *MacKinnon*, 31 Cal. 4th at 648 (citation omitted). The court "must attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the exclusionary language." *Id.* at 649 (citation omitted).

In the Avaron Lawsuit, Avaron alleged that The Crosby interfered with Avaron residents' quiet use and enjoyment by instigating "Operation Honk," a coordinated effort in which residents of The Crosby repeatedly honked their car horns when they passed over speedbumps on Avaron's property. (Avaron Lawsuit Compl., Ex. 2 to Salpietra Decl., ECF No. 15-4 at 59). Avaron alleged that The Crosby intentionally destroyed and removed speedbumps on Avaron's property to allow residents of The Crosby to "drive as fast as they can through the easement without regard for the safety or well being of the residents and guests in Avaron." (*Id.* at 61). Avaron alleged that The Crosby breached the Shared Use Maintenance Agreement by removing speedbumps on Avaron's property. Avaron

sought damages, including punitive damages, termination of The Crosby's rights under the Shared Use Maintenance Agreement, and injunctive relief.

The Policy covers "all Loss which the Not-For-Profit Entity shall be legally obligated to pay as a result of a Claim first made against the Not-For-Profit Entity during the Policy Period or the Discovery Period for a Wrongful Act, and reported to the Insurer pursuant to Section VII." (Policy, Ex. 1 to Salpietra Decl., ECF No. 15-4 at 32 (emphasis omitted)). "Loss" includes "Costs of Defense:" "reasonable and necessary legal fees, costs and expenses incurred in the investigation, defense or appeal of any Claim . . . ." (*Id.* at 13, 14 (emphasis omitted)). A "Wrongful Act" is "any actual or alleged act, omission, error, misstatement, misleading statement, neglect or breach of duty by the Not-For-Profit Entity." (*Id.* at 33 (emphasis omitted)).

The Avaron Lawsuit was filed on May 25, 2018, and alleged "act[s]" and "error[s]" by The Crosby—Wrongful Acts under the terms of the Policy. (*Id.*). The Court has determined that The Crosby reported the Claim to Ironshore on June 4, 2018, pursuant to the terms of the Policy. Accordingly, the Avaron Lawsuit is "a Claim first made against the Not-For-Profit Entity during the Policy Period . . . for a Wrongful Act" (*id.*) that is "potentially covered" unless all of the allegations in the Avaron Lawsuit were barred by the Policy's exclusions at the time of tender. *Barnett*, 90 Cal. App. 4th at 510 (citation omitted).

Ironshore contends that all of the claims in the Avaron Lawsuit are excluded from coverage under the Policy. Ironshore contends that the pollution exclusion bars coverage for the claim that The Crosby residents honked their horns while passing over Avaron speedbumps. Ironshore contends that the property damage and related wrongful acts exclusions bar coverage for the claim that The Crosby removed and destroyed speedbumps on Avaron's property to allow The Crosby residents to speed through Avaron's property.

The Crosby contends that the Policy's exclusions do not negate all possibility of coverage. The Crosby contends that the pollution exclusion does not apply to the allegation that The Crosby residents honked their horns while passing over Avaron speedbumps,

because "occasional car horn honking is not commonly thought of as 'pollution,'" and the term "noise" is ambiguous. (ECF No. 27 at 13). The Crosby contends that neither the property damage exclusion nor the related wrongful acts exclusion applies to the allegation that removal of speedbumps would allow The Crosby residents to speed through Avaron's property, endangering the safety of Avaron residents and guests.

The Policy excludes from coverage "any Claim made against any Insured . . . alleging, arising out of, based upon or attributable to, directly or indirectly resulting from, or in consequence of, or in any way involving, Pollution." (Policy, Ex. 1 to Salpietra Decl., ECF No. 15-4 at 17, 18 (emphasis omitted)). "Pollution" is

> the actual, alleged or threatened discharge, release, escape or disposal of Pollutants into or on real or personal property, water or the atmosphere. Pollution shall also mean any direction or request that the Insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants, or any voluntary decision to do so.

(*Id.* at 15 (emphasis omitted)). "Pollutants" are

> any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on any list of hazardous substances issued by, the United States Environmental Protection Agency or any state, county, municipality or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. Pollutants shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products and any noise.

(*Id.* (emphasis omitted)).

In order for the pollution exclusion to bar coverage for the allegation that residents of The Crosby repeatedly honked their car horns when they passed over speedbumps, the exclusion must "conspicuously, plainly and clearly apprise[ ] the insured" that honking a car horn "will not be covered." *MacKinnon*, 31 Cal. 4th at 649 (citation omitted). Although the Policy defines pollutants to include "any noise," the term "any noise" "is not to be read literally and in isolation, but must be construed in the context of how it is used in the policy,

17

i.e., defining 'pollutant.'" *MacKinnon*, 31 Cal. 4th at 652 (quoting *Reg'l Bank of Colo. v. St. Paul Fire & Marine Ins. Co.*, 35 F.3d 494, 498 (10th Cir. 1994)). The court must interpret the terms "pollution" and "pollutant" as an "ordinary layperson," giving the terms their "common connotative meaning." *Id*. If "there is any [ ] reasonable interpretation" of the pollution exclusion that would not bar coverage for the Operation Honk allegations, "the exclusion must be interpreted in favor of coverage." *Id.* at 655-56. It is reasonable that a layperson may not consider someone honking their horn while they pass over a speedbump to be a pollutant or pollution. *See id.* at 655 ("[T]he interpretation of the pollution exclusion as limited to conventional environmental pollution is . . . reasonable."). Based on the Policy provisions and the allegations in the Avaron Lawsuit complaint, the Court concludes that interpreting the pollution exclusion to include car horn honking is not the *only* reasonable interpretation. *See id.* Accordingly, at the time of tender, the exclusion did not "plainly and clearly" exclude coverage for the allegation that residents of The Crosby repeatedly honked their car horns when they passed over speedbumps. *Id.* Construing the terms "pollution" and "pollutants" as a layperson would, resolving any ambiguities in the insured's favor, and construing the Policy's exclusions in the insured's favor, the Court concludes that that the pollution exclusion did not establish the absence of any potential for coverage of the Operation Honk allegations at the time of tender. *See id* 648; *E.M.M.I.*, 32 Cal. 4th at 470; *Montrose*, 6 Cal. 4th at 295.

The Policy excludes from coverage "any Claim made against any Insured . . . for any actual or alleged . . . damage to or destruction of any tangible property, including the loss of use thereof." (Policy, Ex. 1 to Salpietra Decl., ECF No. 15-4 at 17 (emphasis omitted)). The Policy further excludes from coverage "any Claim made against any Insured . . . alleging, arising out of, based upon or attributable to, any Wrongful Act or Related Wrongful Act or any fact, circumstance or situation which has been the subject of any notice or Claim given under any other policy of which this Policy is a renewal or replacement." (*Id.* (emphasis omitted)). "Related Wrongful Acts" are "Wrongful Acts

which are the same, related or continuous, or Wrongful Acts which arise from a common nucleus of facts." (*Id.* at 15 (emphasis omitted)).

Avaron alleged that The Crosby's removal of speedbumps would allow residents of The Crosby to "drive as fast as they can through the easement without regard for the safety or well being of the residents and guests in Avaron." (Avaron Lawsuit Compl., Ex. 2 to Salpietra Decl., ECF No. 15-4 at 61). This allegation goes beyond mere property damage and is not clearly excluded by the property damage exclusion. In 2015, The Crosby submitted a claim to Ironshore under a previous policy for a lawsuit by Avaron alleging that The Crosby "failed to enforce the posted speed limit and stop signs" on Bing Crosby Boulevard, "creat[ing] a safety hazard . . . ." (2015 Avaron Compl., Ex. A to Def.'s App'x, ECF No. 21 at 15, 16). However, the 2015 lawsuit did not allege that The Crosby was creating a safety hazard by removing speedbumps on the easement road. The Court cannot conclude that the 2018 lawsuit and the 2015 lawsuit arose from related acts and breaches of duty. Based on the allegations in the 2018 Avaron Lawsuit complaint and the facts known by Ironshore at the time of tender, the Court concludes that neither the property damage exclusion nor the related wrongful acts exclusion established the absence of any potential for coverage coverage of the allegations related to The Crosby residents speeding through the easement at the time of tender. *See Montrose*, 6 Cal. 4th at 295.

Construing the exclusions and ambiguities in the Policy in The Crosby's favor, the Court concludes that The Crosby has met its burden to demonstrate that the facts alleged in the Avaron Lawsuit complaint gave rise to at least one potentially covered claim at the time of tender, requiring Ironshore to immediately defend all claims asserted in the Avaron Lawsuit. *See Barnett*, 90 Cal. App. 4th at 510.

### c. **Breach of the Duty to Defend**

The Crosby contends that Ironshore breached its duty to defend by failing to acknowledge tender until July 9, 2018—one day before The Crosby's responsive pleading was due—when Ironshore stated that it had no duty to defend. The Crosby contends that

Ironshore provided no defense and failed to pay any incurred defense costs until over a year after tender.

Ironshore contends that it agreed to advance The Crosby's defense costs after a reasonable nine-week delay. Ironshore contends that it did not begin advancing costs until July 2019 because The Crosby did not submit any bills to Ironshore until November 2018, and Procopio did not provide its case report and budget until March 2019.

"Once the duty to defend attaches, the insurer is obligated to defend against all of the claims involved in the action, both covered and noncovered . . . ." *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993) (citations omitted). "Imposition of an immediate duty to defend is necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf." *Montrose*, 6 Cal. 4th at 295; *see Buss*, 16 Cal. 4th at 49 ("To defend meaningfully, the insurer must defend immediately. To defend immediately, it must defend entirely." (citation omitted)). "If the insurer is obliged to take up the defense of its insured, it must do so as soon as possible, both to protect the interests of the insured, and to limit its own exposure to loss. Unlike the duty to indemnify, which is only determined after liability is finally established, the duty to defend must be assessed at the outset of the case." *CNA Cas. of Cal. v. Seaboard Sur. Co.*, 176 Cal. App. 3d 598, 605 (1986) (citations omitted). "The duty to defend arises on tender of defense and continues until the underlying lawsuit is concluded or until the insurer establishes, by reference to undisputed facts, the absence of any potential for coverage." *El-Com Hardware*, 92 Cal. App. 4th at 213 (citing *Montrose*, 6 Cal. 4th at 300); *see Nat'l Union Fire Ins. Co.*, 466 F. App'x at 655 ("The duty to defend continues 'until [the insurers] can conclusively refute th[e] potential' that liability will arise under the policies." (alterations in original) (quoting *Montrose*, 6 Cal. 4th at 299)). "[A] belated offer to pay the costs of defense may mitigate damages but will not cure the initial breach of duty." *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 881 (2000), *as modified on denial of reh'g*, 2000 Cal. App. LEXIS 230 (Mar. 29, 2000).

In this case, Ironshore failed to respond to The Crosby's notice of tender until July 9, 2018, over a month after tender. On July 9, 2018, the Senior Claims Specialist stated that "Ironshore does not have a duty to defend . . . ." (Adjuster Email, Ex. 5 to Salpietra Decl., ECF No. 15-4 at 69). Ironshore denied coverage of the Avaron Lawsuit on July 13, 2018, and July 24, 2018. On July 24, the Senior Claims Specialist wrote to The Crosby's counsel, Rick Salpietra, that "[Ironshore] will not be providing a defense for the Lawsuit and it will be necessary for Crosby to coordinate its own defense and response to the Lawsuit." (Denial Letter, Ex. 8 to Salpietra Decl., ECF No. 15-4 at 80). On August 20, 2019, after The Crosby's responsive pleading was due, Ironshore "agree[d] to provide a defense to the Lawsuit . . . ." (Lewis Letter, Ex. 9 to Salpietra Decl., ECF No. 15-4 at 86-87). However, Ironshore did not offer to or appoint defense counsel and did not participate in The Crosby's defense. Ironshore did not advance any defense costs until July 2019, over a year after tender. The Crosby has come forward with evidence that Ironshore failed to immediately mount and fund a defense. *See Buss*, 16 Cal. 4th at 49, 59 & n.23. Ironshore has failed to demonstrate that a material issue of fact exists as to whether it immediately mounted and funded a defense. The Court concludes that the undisputed facts demonstrate that Ironshore breached its duty to defend the Crosby in the Avaron Lawsuit.

## V. UNAUTHORIZED RETENTION

The Crosby asserts that it is entitled to summary judgment on the third claim against Ironshore for breach of contract (unauthorized retention) and the fifth claim for declaratory relief. The Crosby contends that the Policy does not condition Ironshore's duty to defend on The Crosby's satisfaction of a retention. The Crosby contends that the Policy conditions only the duty to advance defense costs on the satisfaction of a retention, which is different from the duty to defend. The Crosby contends that it is entitled to a declaratory judgment that "the Policy's $50,000 retention does not apply where the Insured has tendered the defense of a Claim and Ironshore has assumed the duty to defend." (ECF No. 1 ¶ 58). The Crosby contends that Ironshore breached the terms of the Policy by requiring The Crosby to satisfy a $50,000.00 retention as a condition of the defense of the Avaron Lawsuit.

Ironshore contends that the Policy expressly requires The Crosby to satisfy a $50,000 retention before Ironshore is obligated to pay Loss. Ironshore contends that the Policy does not impose any duty to defend on Ironshore, and The Crosby is required to satisfy the retention before Ironshore has a duty to pay defense costs. Ironshore contends that "even if a 'duty to defend' existed, it does not negate all terms of the Policy requiring advancement of defense costs only after Crosby pays the retention . . . ." (ECF No. 16 at 25).

"A 'self-insured retention,' or 'retained limit,' generally refers to the amount of a loss or liability that the insured agrees to bear before coverage can arise under the policy." *Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677, 694 (2010). "[T[he impact of a policy reference to a 'self-insured retention' or 'retained limit' on the duty to defend will depend on the language of a particular policy." *Id.* "Any limitation on coverage otherwise available under the policy 'must be stated precisely and understandably, in words that are part of the working vocabulary of the average layperson.'" *Id.* (quoting *Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1204 (2004)). "[A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." *State Farm Mut. Auto. Ins. Co. v. Jacober*, 10 Cal. 3d 193, 201 (1973) (citation omitted). Absent an "express limitation on the duty to defend," the duty to defend is not limited by a retention. *Legacy Vulcan*, 185 Cal. App. 4th at 697.

In *Legacy Vulcan*, an insurance policy limited the insurer's duty to indemnify to amounts in excess of a retention. *Id*. The California Court of Appeal determined that the insured was not required to satisfy a retention as a condition of the insurer's duty to defend. The court explained,

> To require the exhaustion of a self-insured retention before an insurer will have a duty to defend would not ensure that the defense obligation rests on the insurer receiving premiums for that risk, but instead would result in no insurer providing a defense prior to exhaustion. Moreover, in the absence of

clear policy language so providing, to require the exhaustion of a self-insured retention before an insurer will have a duty to defend would be contrary to the reasonable expectations of the insured to be provided an immediate defense in connection with its primary coverage. If, under the terms of the policy, the insured would have a reasonable expectation that the insurer would provide a defense, any limitation on the insurer's defense obligation must be conspicuous, plain and clear.

*Id.* at 696 (citations omitted).

In this case, the "Declarations" section of the Policy states, "RETENTIONS: (a) Claim other than an Employment Practices Claim: $50,000 . . . ." (*Id.* at 7 (emphasis omitted)). The Policy provides, "The Retention . . . shall apply to all covered Loss, including Costs of Defense." (*Id.* at 19 (emphasis omitted)). The Policy provides, "One Retention shall apply to Loss arising from each Claim alleging the same Wrongful Act or Related Wrongful Acts. The Not-For-Profit Entity shall be responsible for, and shall hold the Insurer harmless from, any amount within the Retention." (*Id.* (emphasis omitted)). The Policy provides, "The Insurer shall be liable to pay Loss in excess of the applicable Retention amount . . . up to the Limit of Liability." (*Id.* (emphasis omitted)). The Policy provides, "The Insurer shall advance Costs of Defense prior to the final disposition of any Claim, provided such Claim is covered by this Policy. Any advancement shall be on the condition that: . . . (1) the appropriate Retention has been satisfied . . . ." (*Id.* at 20 (emphasis omitted)).

The Policy conditions the duty to advance defense costs on The Crosby's satisfaction of a $50,000 retention. The Policy does not clearly or explicitly provide that The Crosby is required to satisfy any retention as a condition of the duty to defend. The Court concludes that the retention does not apply when the duty to defend is triggered. Accordingly, The Crosby is entitled to a declaration that "the Policy's $50,000 retention does not apply where the Insured has tendered the defense of a Claim and Ironshore has assumed the duty to defend." (ECF No. 1 ¶ 58).

On July 9, 2018, in response to Rick Salpietra's inquiry regarding Ironshore's defense of the Avaron Lawsuit, the Senior Claims Specialist stated, "Under the Policy, Ironshore does not have a duty to defend and the Insured has a retention." (Adjuster Email, Ex. 5 to Salpietra Decl., ECF No. 15-4 at 69). On August 20, 2018, Ironshore agreed to provide a defense subject to a full reservation of rights, including a $50,000 retention. On September 14, 2018, the Senior Claims Specialist sent Rick Salpietra an email stating that Ironshore would not pay $450.00 per hour for Procopio attorney Rebecca Reed, "nor will that amount be applied to the retention." (Adjuster Email, Ex. L. to Def.'s App'x, ECF No. 21 at 129). The Senior Claims Specialist stated that The Crosby could choose to pay Reed's hourly rate "above the Ironshore rate and outside their retention." (*Id.*). The Crosby agreed. Ironshore did not provide any defense to the Avaron Lawsuit and did not begin to pay defense costs until July 2019. The Crosby has come forward with evidence that Ironshore breached the terms of the Policy by requiring the Crosby to satisfy the $50,000 retention because the duty to defend was triggered, rather than the duty to advance defense costs. Ironshore has failed to demonstrate that a material issue of fact exists as to whether Ironshore breached the terms of the Policy by requiring The Crosby to satisfy the retention as a condition of the duty to defend. The Court concludes that the undisputed facts demonstrate that Ironshore breached the terms of the Policy by requiring The Crosby to satisfy a $50,000 retention.

## VI. CONCLUSION

IT IS HEREBY ORDERED that the Motion for Partial Summary Judgment filed by Plaintiff The Crosby Estate at Rancho Santa Fe Master Association (ECF No. 15) is granted. Summary judgment is granted in favor of The Crosby Estate at Rancho Santa Fe Master Association on the first claim for breach of contract, the third claim for breach of contract, and the fifth claim for declaratory relief.

Dated:  November 3, 2020

Hon. William Q. Hayes
United States District Court